Parker C. J.
delivered the opinion of the Court. The person summoned as trustee in this case, admits himself to be indebted to Williams, the defendant in the action, but objects to being charged as trustee, on account of the bankruptcy of Williams in England, and the assignment of his estate and effects by the commissioners appointed according to the laws of that country, which assignment he supposes transferred this debt to the assignees, and thus that it is taken out of the operation of our trustee process.
This process was served after the commission of bankruptcy issued, and after the assignment made by the commissioners, but before any notice thereof was given to the plaintiff in the action, or to Marshall, the supposed trustee.
*305 By our law the service of a trustee process upon one who is indebted to the defendant in the suit, creates a lien upon the debt in favor of the plaintiff in the action ; so that if he recovers judgment against the principal, he shall have execution against the trustee to the amount of the effects in his hands, or the debt which he owes, and no distinction is made in the application of this law, between citizens, who may be trustees of other citizens, and those citizens who may be indebted to a person residing in a foreign country, who is indebted to citizens of the United States. Nor is the benefit of the law confined to citizens of the United States ; for foreign merchants coming here and finding property or debts of their debtor here, may attach them as our own citizens may. The plaintiff therefore has a right to an adjudication against Marshall as the trustee of Williams, unless the bankruptcy and proceedings under it have transferred this debt to the assignees, so that in effect Marshall was not the debtor of Williams, but of the assignees of Williams, at the time of the service of the writ. In regard to goods and merchandise belonging to a foreign bankrupt or insolvent person found here, if attached before any possession is taken by the assignees, whether under a commission of bankruptcy or otherwise, the attaching creditor would hold, because delivery, either actual or constructive, is necessary to complete the transfer ; but in regard to choses in action, as debts due to the bankrupt, the mere assignment, if valid in law, passes the property, because they are incapable of delivery, and notice to the debtor is not essential to the transfer,- otherwise than to protect him in case he should pay over to his creditor after the assignment without notice.
This case raises a question which has been treated by various judicial tribunals as of great magnitude, and as of a general and national, rather than a municipal character ; and such is the difference of opinion among learned judges and eminent jurists, that it is difficult to affirm where the weight of argument lies. Our duty however does not require us to enter much into the discussion of the general principles which may be supposed to affect the question ; we shall rather look for authority, because, if there is a received and settled law upon the subject, we shall feel ourselves bound to observe it, although we might *306 think that the improved state of the world in regard to its coni mercial relations requires a more liberal system than that law sanctions ; for it is not for one out of a cluster of States, whose jurisdiction is limited in its objects, to affect to improve its jurisprudence by the introduction of rules supposed to be called for by enlarged policy in regard to objects of a general nature. Such changes, if within judicial power, should be wrought by the supreme court of the nation, and if not, by other constituted authorities of the nation, either by treaty with foreign powers, or by legislative enactment. We must be allowed therefore to discharge ourselves of this case on narrower grounds than its importance, or the very elaborate arguments with which we have been favored, would seem to require.
Does then a commission of bankruptcy in England and an assignment of the bankrupt’s effects under it, so transfer a debt due to the bankrupt from a citizen of this State to the assignees, that another citizen who is a creditor of the bankrupt cannot seize it on a trustee process and secure it to himself ?
We think it very clear that this question has not been set tied in the affirmative in this State, nor in any other State in the Union, nor in the Supreme Court of the United States, but on the contrary, that whenever the question has been raised, it has been determined in the negative. With respect to our own State, the question has not been settled either way directly, though there are some cases in which it has incidentally occurred; but from these nothing favorable to such assignments can be inferred.
An expression of Chief Justice Parsons in the case of Goodwin v. Jones, 3 Mass. R. 517, is relied upon. Too much stress is laid upon that expression, considering that it is rather a statement of the argument of counsel which he ‘s undertaking to answer, than an opinion of his own.[1] He says, “ It is admitted that the assignee of a bankrupt duly appointed pursuant to the laws of the State where the bankrupt dwells, may maintain an action in that character in any other State, the *307 laws of which are not repugnant to his recovery.” Now the very question here is, whether the laws of this State are not repugnant to his recovery ; and this cautious qualification of the admission has at least as much bearing as the admission itself. But even if the admission were unqualified, as the question supposed to be involved in it was not before the Court, it could not be received as authority.
The case of Dawes, Judge, v. Boylston, is cited for the assignees, but if any thing touching the question is to be inferred from that case, it is, that the assignment under a commission of bankruptcy has no effect against the creditors of the bankrupt here. Neither do we see any thing in the case of Blanchard v. Russell, Baker v. Wheaton, or Watson v. Bourne, which sustains the position advanced by the counsel for the assignees, viz. that the assignment under a foreign commission of bankruptcy transfers the property and debts of the bankrupt here, so as to prevent an attachment by our creditors.
The question in all those cases related only to the effect of a discharge under the laws of the State where the contract was made, upon the demand of a creditor when sued in another State. Observations which might have fallen from judges in the course of the opinions given by them, of a more general nature than the subject required, cannot be considered as authorities. It is the point decided which becomes the precedent ; what is said arguendo by a judge, ought to have little if any more weight attached to it, than if said by counsel. It would be altogether unjust to give to remarks of the kind the force of judicial decisions. We do not perceive, however, in any of the cases cited, even an intimation that the property of a bankrupt in this country, or his debts here, passes to his assignees in a foreign country by force of the assignment under the commission.
In regard to the case of Blanchard v. Russell, which has frequently been referred to in the argument of the counsel for the trustees, it should be remarked, that the principal question discussed is the constitutionality of State insolvent laws; whether they so impaired the force and obligation of contracts as to come within the prohibitory clause of the constitution ot *Ve United States. It is true, in the opinion delivered, the *308 position was attempted to be maintained, that contracts were to ^6 interpreted and construed by the existing laws of the State within which they were made ; and also, that what would operate a legal discharge of the contract in that State, would have the same effect elsewhere ; and hence it was intimated, that an American citizen, who should become creditor of an English merchant by a contract made in England, might be barred of his debt by a certificate of discharge duly obtained under a regular commission of bankruptcy in England. This position has been questioned, and so far as any judicial decision can be predicated of the case of Ogden v. Saunders, 12 Wheaton, it may be considered to be overruled ; for although in that case the legal effect of a State insolvent law is to a certain extent admitted, yet this effect is limited by the decision to cases between parties who are both citizens of the State where the law is enacted, and to suits brought in the courts of that State.[1] But whether this Court were right or wrong in the position so laid down, it does not follow that assignments of the commissioners would so divest the property of the bankrupt that it would cease to be subject to our attachment laws. The case supposed is of a particular creditor, who by reason of the nature and locality of his contract might be deprived-of his debt by a plea of a certificate of discharge, upon the ground that he is virtually a party to the commission, leaving untouched the case of an American creditor whose debt was not so situated, and who had, by virtue of our statutes, acquired a lien by attachment, or under the trustee process.
On the other hand, the case of Ingraham v. Geyer, 13 Mass. R. 147, in quite unambiguous terms asserts the right of an attaching creditor within our jurisdiction, he being a citizen of this State, as paramount to the right of assignees claiming by virtue of a transfer from the debtor himself. in another State. This case has been sometimes cited in this Court and elsewhere, as having decided that in all circumstances an attaching creditor here would prevail over th. assignee of the debtor under a transfer made abroad; but wt *309 do not think it was intended, or that it does in its terms go to that extent. The assignment set up was clearly void according to the law of this State. It was said it was valid in Pennsylvania, where it was made ; the Court said, admit it to be so, nevertheless it would not be received here as valid against our citizens, because it was unjust and unequal in its ■ effect upon them. The meaning was, that though by comity the laws of other States, and contracts made under them, are to be received and allowed here, yet this case would c'ome within the acknowledged exception to that general rule, viz. that our own citizens should not be prejudiced thereby. It was certainly not intended to decide, that a bona fide transfer by a debtor abroad to his creditors, or to trustees for their use, in such form as would be valid to pass the property if made within this State, would be set aside for the benefit of creditors who had acquired no lien until after the making of such assignment.[1] And therefore we do not think a decision against the operation of an assignment by commissioners under the bankrupt laws of England, draws after it the inference, that an assignment made by the debtor himself without the intervention of a commission of bankruptcy, if such assignment were lawful in the place where made, would be unavailing.[1] In regard to the intimations given in the case Dawes, Judge, v. Head, 3 Pick. 128, [2nd. ed. 148, note 1,] which are thought by counsel to be applicable to the case before us, it should be considered that that was a case of insolvency recog nised by our statutes, and for which an equal distribution is provided among the creditors. The desire of the Court was, that the foreign creditors should share in the distribution, instead of applying the whole effects found here to the payment of our own citizens. There was no attachment law to interfere, and the way seemed to be open to introduce a liberal system for the settlement of estates of deceased insolvent persons ; but it was supposed to be a necessary part of that system, that the effects found here should be here distributed in just proportion to the whole property and all the debts; *310 whereas the effect of the principle contended for in this suit, is t0 break down the attachment law and transfer all the effects to a foreign country, to be there distributed, much to the inconvenience certainly of some if not all the creditors of the bankrupt here.
There being no case in Massachusetts which can sustain the claim of the assignees of the bankrupt, we have examined the reports of adjudicated cases in other States, in order to ascer tain what the law is among them ; and with the exception of the case of Holmes v. Remsen, 4 Johns. Ch. R. 460, it may be safely asserted, that not one out of the numerous State courts has adopted the doctrine sought to be maintained in defence of this suit.
In North and South Carolina,[2] in Virginia, and in Pennsylvania[3] and Maryland, it has been expressly decided, that such assignments have no efficacy against attachments made within their several jurisdictions;[4] and if in some of those States these decisions have been founded upon particular legislative enactments, it is very certain, that in regard to Pennsylvania, the opinion of the court was the result of a deliberate and learned discussion of general principles of jurisprudence, as well as a critical examination of most of the important decisions in England upon the subject.
In addition to this, there is the strong, unqualified assertion of Chief Justice Marshall, speaking for the court, in the case of Harrison v. Sterry, 5 Cranch, that “ foreign bankrupt laws do not operate to transfer the property of bankrupts within the United States.” This decision, it is true, has been found fault with as not being accompanied with any reasoning tending to showfits correctness. It can hardly be supposed, however, that it slipped inadvertently from a mind so unapt to entertain or promulgate loose opinions, as that of Chief Justice Marshall, and that its unsoundness should also have escaped the attention of the other acute members of that court. It ought rather to be supposed, that it was considered a maxim too well sup *311 ported by authority, and too well known in practice, to require the support of argument. And I am inclined to think, that were it not for the profound and captivating discussion of Chan-cellar Kent in the case of Holmes v. Remsen, the truth of the maxim as stated by Chief Justice Marshall would not have been called in question.
In regard to the last mentioned case, it cannot be considered as settling the law even in New York. The most that can be made of it is, that it gives the opinion of a most accomplished and enlightened jurist in favor of the position, he sitting in chancery, not feeling himself shackled by the technical rules of the common law, and feeling a generous ambition to introduce into the code of the State with which his name is identified, a broad and liberal rule fit for the government of the whole mercantile world, of which no man is better suited than himself to be the legislator. I scruple not to say, that the principles which he advances, and the system which he wished to enforce, ought to belong to the code of nations, arid that it would be happy, if, by treaty between this country and the civilized nations of Europe, the principles which received his powerful support should be made to constitute a branch of the jus gentium, and that a place for its execution with fairness and reciprocity should be adopted ; but until that shall be done, there seem to be insuperable difficulties in the way of a partial adoption of it by one country, or rather by one small section of the country, when the greater part of the rest of the world might repudiate it. I will only refer to the very able argument of a sound common lawyer, Mr. Justice Platt of the same State, to show the improbability that the opinion of Chancellor Kent will be adopted as the law of the State of New York.
And we may now conclude, as that eminent man himself has done in his recent work, which does himself so much honor and the public so much good, that the American law is decisively in opposition to the opinion which he maintained in the case of Holmes v. Remsen. And thus ought this case to oe settled, for we cannot receive the law of any foreign country; and however well disposed the English courts may be to adopt a more enlarged and liberal system, and however successfully the recent decisions in that country may have contributed to *312 that end, we do not think ourselves at liberty to follow m a tra*n which partakes so much of judicial legislation. Down to the time of our Revolution, we think the adjudications in the courts of law in England would fully justify the position laid down by Chief Justice Marshall in the case of Harrison v. Sterry, viz. that foreign bankrupt laws do not operate to pass the property of bankrupts in other countries. It was certainly so in the time of Lord Mansfield, and no one will deny him the credit of being willing to liberalize the law in all matters relating to commerce or the intercourse of merchants.
In the case of Cleve v. Mills, tried before him at the Cockpit, he is stated to have said, that the statutes of bankruptcy do not extend to the colonies or any of the King’s dominions out of England, but the assignments under such commissions are considered as voluntary, and as such can take place between the bankrupt and the assignee, but do not affect the rights of any other creditor. 1 Cooke’s B. L. 243.
And in the case of Le Chevalier v. Lynch the whole court of King’s Bench affirmed the same doctrine. A creditor of the bankrupt, against whom a commission had issued in England, attached a sum of money in the hands of a debtor of the bankrupt in St. Christopher, an island within the British do minions, and this attachment was held good. Lord Mansfield says, if a bankrupt has money due to him out of England, the assignment under the bankrupt laws so far vests the right to the money in the assignees, that the debtor shall be answerable to them. But if, in the mean time, after the bankruptcy and before payment to the assignees, money owing to the bankrupt out of England is attached bona fide by regular process, according to the law of the place, the assignees in such case cannot recover the debt.' Doug. 161. And the same prin ciple is affirmed by the same eminent judge in the case ot Waring v. Knight, 1 Cooke’s B. L. 307.
Now this was the law of England down to 1768, and therefore the law of this country. I do not know what can be said in answer, unless it be, that though the laws of the colonies, and of other countries, did not recognise the English statutes of bankruptcy, and therefore the English courts were obliged to give effect to the judgments which took from their operation *313 the effects of bankrupts, yet nevertheless this was wrong and that the courts of other countries ought to adopt a more liberal principle. But however satisfied we may be of this admonition, certainly on the question what is the law, it cannot be suffered to have any influence.
The Scotch courts, until a comparatively recent period, understood the law as Lord Mansfield did, and uniformly gave preference to their arrestments over the assignments of commissioners under the English Bankrupt laws, as appears by the case of Thorold v. Forest, 2 Dow, 237, and some other Scotch cases which have been cited. During this time however the law must be considered as quite unsettled in England, or else the courts of common law and chancery proceeded upon very different principles, for in the year 1769 in the case of Joliet v. Deponthieu, and Solomons v. Ross in the year 1764, full effect was given in the court of chancery, to a process similar to a commission of bankruptcy in England, by allowing the creditors of the bankrupt’s estate to recover a debt from an English subject, although it had been attached after the appointment of curators, by another English subject. This was certainly contrary to Lord Mansfield’s doctrine, that a commission of bankruptcy does not reach beyond the jurisdiction where it issued. It is probable, however, that it was not of right, but of comity, that this proceeding was had. The neighbourhood of Holland, its intimate connexion with England in commerce, and the actual or expected reciprocity in regard to English commissions of bankruptcy, without doubt influenced the opimon of the chancellor; for if it was considered as the necessary result of legal obligation, how is it to be accounted for, that in 1779, the same high court, held by commission, should have decided that the assignment did not divest the property of the bankrupt, as the debt was due in the plantations, but that it only gave the assignees the right to sue for it ; that the creditor in Rhode Island, a British province at the time of the transaction, had also a right to sue, and by his judgment had obtained a priority ? The true reason for this contrariety of decision is the one, probably, stated by the Lords Commissioners, viz. that in the case of Solomons v. Ross and Jollet v. Deponthieu, which were Dutch bankrupt *314 cíes, “ there were bankrupt laws in Holland, but none in the plantationsThus intimating, that where there would be reciprocal advantages the proceedings in the foreign commission would by comity be allowed to operate in England.
It would be useless to go over the numerous decisions which have taken place in England since our Revolution, it being very obvious that there has been a gradual extension of the legal effect and operation of commissions, until at last it has got to be the opinion of very eminent judges, as it is that of Chancellor Kent, that they are universal in their operation, within the United Kingdom and without, and that all the property of the bankrupt, wherever situated, is transferred by the assignment: and so strong is the opinion in the minds of some eminent judges, that they hardly deem any nation entitled to the appellation of, civilized, which does not admit and enforce the same doctrine.
They first began by obliging the English creditor, who had possessed himself of the property of the bankrupt in a foreign country, to refund to the assignees ; and this is wholly unobjectionable, for being a subject of the laws, he ought not to be allowed an advantage over creditors of the same country, but should be considered as the agent of the assignees in collecting the effects of the bankrupt.
I believe this is the whole extent of any English adjudications, for all beyond is only the expression of very strong opinions by individual judges. Sill v. Worswick, 1 H. Bl. 615; Hunter v Potts, 4 T. R. 182; Ex parte Frank, 1 Cooke’s B. L. 336, and many other cases. The Scotch courts have followed the English, as was to be expected, considering the almost nominal independence of their judiciary upon that of England. There is no case in which the right of a foreign country to deny this full effect to English commissions has been questioned; so that after all it is a mere question of comity, which will be determined by the courts of every nation according to those circumstances existing there, which ought to affect a question of that kind. It cannot be considered a principle of universal law which every nation is bound to recognise. In Holland and France, where there are bankrupt laws, it is without doubt convenient *315 to give effect to the bankrupt laws of England, she reciprocaling the indulgence. The daily intercourse between those countries and their proximity, render it quite easy for the creditors of each to prosecute their claims in the tribunals of either : and if there were a bankrupt law in the United States, such is the increased facility of communication with England, that ir. many cases it would not be very inconvenient for merchants in either country to transmit their claims to the other.
But the want of such laws here seems to remove all ground of reciprocity. If the merchant of New York or Boston becomes insolvent, having property or debts in England, the English creditor may avail himself of them without being subject to refund or distribution. But giving force to the English bankrupt laws here would deprive the American creditor of the right of priority secured to him by the laws of his own State or country. And then again, if this is a matter of law, of right and not of comity, it must be exercised towards the most distant as well as towards the nearest nations, towards Russia and the British dominions in India, as well as towards the Island of Great Britain ; and great inconveniences cannot but suggest themselves as arising out of this broad and universal system. It may be well at some future time, when there shall be bankrupt laws here, to accept the proffer of Great Britain, France, or Holland, to reciprocate the benefits of such a system, but we are persuaded, if such a change shall take place, it must be under the auspices of the national legislature, or the national courts, or of some treaty with the commercial nations of Europe, and not by the adjudications of a court of one out of the numerous governments which compose the United States.
It is asked, whether we should not give force to the assignment of property here by its owner abroad, when the object is to pay or secure particular creditors to the prejudice of the rest. An affirmative answer to this question does not involve the necessity of giving the like force to assignments under a commission of bankruptcy. The former would be consistent with our laws and our practice ; it is merely acknowledging the personal right of the proprietor to dispose of his effects for honest purposes. The latter is yielding to the law of another *316 country, which we are not obliged to do, and cannot without establishing a law in Massachusetts which is not recognised anywhere else in America. We do not deny the principles which attach themselves as maxims to personal property, that it. has no situs, follows the person of the owner, and at his death is to be distributed according to the laws of the domicile of the owner.[1] But the relation of debtor and creditor, and the rights of the latter over the effects of the former, aie distinct objects of jurisprudence within the control of the legisla tive power of the country where the property is. This power is absolute and uncontrollable ; it may be unreasonably exercised, but still it is legal, if so willed by a sovereign independent power, for the dominion is here. Such was the law of England ; before, upon principles of comity only, the code was accommodated to the mercantile situation of that country, and even now doubts occasionally spring up in the minds of great judges whether the new system rests upon a solid basis ; for as late as the year 1817, we find that great jurist, Sir William Grant, hesitating between the old and the new principle, and manifesting a strong inclination toward the opinion of Lord Chief Justice Eyre, who dissented from the other judges in the case of Phillips v. Hunter. Birchwood v. Miller, 3 Meriv. 279.
In this state of things, the principle having been applied in England as yet only to cases arising in countries where bankrupt laws or something equivalent exist, it having been nowhere adopted in America except in the solitary instance of the chancery decision in New York, and having been expressly rejected by one tribunal of paramount authority, and another of the highest respectability ; we think it would be presumptuous in this Court to open the acknowledged code to the reception of a rule, which, however reasonable and beneficial if universally admitted, would be likely to produce embarrassment and inconvenience if so partially introduced.
With respect to the other ground upon which it is sug gested that the trustee ought to be discharged, viz. that the *317 drat he owes to Williams was contracted in England and is payable there only, so that he could not and therefore the present plaintiff cannot make it payable here, we do not perceive any legal principle upon which the objection rests. It is a common mercantile debt, arising from acceptances and advances for which no funds were provided, or if provided, were not realized. This was a debt from Marshall every where, in whatever country his person or property might be found. A suit might have been maintained by Williams here, and therefore the debt may be attached here. The cases cited in support of this objection do not apply. That of Maine F. & M. Ins. Co. v. Weeks, 7 Mass. R. 438, only decides that there must be a right of action in the principal against the trustee, to sustain the process, and we think there clearly was in this case; and that of Clark v. Moody, 17 Mass. R. 145, regards only the liability of a factor to an action, where goods are received by him on consignment.
We see no reason therefore why the trustee in this case should not be charged.[1]

 See Story’s Confl. Laws, 345, note 2.

See Braynard v Marshall, 8 Pick. 194; Pitkin v. Thompson, 13 Pick. 64

 But see Fox v. Adams, 5 Greenl. 245; Lord v. Brig Watchman, 8 Amer. Jurist, 284.

 See. Green v. Mowry, 2 Bailey, 163.

 See WNeilv. Colquhoon, 2 Hayw. 24; Robinson v. Crowden, 4 M'Cord 519.

 See Mullikin v. Aughinvaugh, 1 Pennsyl. R. 117.

 The same has been decided in New Hampshire; Saunders v Williamis 5 New Hampsh. R. 213.

 See Dawes v. Head, 3 Pick. (2nd ed.) 144, note 1; Story’s Confl. of Laws 312, 313.

 See Story’s Confl. Laws, § 403 to § 422, p. 336 to 355; 2 Kent’s Comm. (3d ed.) 404 to 407; Saunders v. Williams, 5 N. Hamp. R. 213; Plestoro v. Abraham, 1 Paige, 236; Abraham v. Plestoro, 3 Wendell, 538; Olivier v. Townes, 14 Martin’s (Louis.) R. 93; Fox v. Adams, 5 Greenl. 245; Lord v. Brig Watchman, 8 Amer. Jurist. 284; Angell on Assignments, 57 to 65; Adams v. Cordis, 8 Pick. 200.